**George W. WALDROUP and Bettie Waldroup, Respondents,**

v.

**Lonnie DRAVENSTOTT d/b/a L.D. Construction, Appellant.**

**No. WD 54085.**

Missouri Court of Appeals, Western District.

April 14, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1998.

Application for Transfer Denied Aug. 25, 1998.

**366**

Timothy D. Tipton, Excelsior Springs, Bruce B. Brown, Kearney, for Appellant.

K. Colleen Nunnelly, Liberty, for Respondents.

Before ULRICH, C.J., P.J., and LOWENSTEIN and HOWARD, JJ.

HOWARD, Judge.

This is an appeal from the trial court's judgment in favor of George and Bettie Waldroup on their action against Lonnie Dravenstott for breach of a contract to construct a workshop and failure to comply with the applicable building codes. Dravenstott raises three points on appeal. First, he contends that the trial court erred because the evidence indicates that he constructed the building in accordance with the contract and a plan provided by George Waldroup. Second, he contends that the Waldroups waived all alleged breaches in the contract. Third, he claims the trial court erred in awarding the Waldroups an attorney's fee, prejudgment interest, and a per annum inflationary rate on the damage amount.

### Facts

On October 25, 1994, Appellant Lonnie Dravenstott, d/b/a L.D. Construction, and Respondents George and Bettie Waldroup signed a proposal wherein Dravenstott would build a "64 by 30 workshop" for a total cost of $18,497.62. Mr. Waldroup had previously done some site preparation, including some grading, filling in gravel, and setting some of the outside posts for the walls. Construction began in November 1994, and shortly thereafter Mr. Waldroup paid Dravenstott the front half of the cost, or $9,248.81. Upon Dravenstott's presentation of a final bill, Waldroup paid the full amount due.

At trial, Mr. Waldroup testified about numerous complaints involving the construction of the building, including failures to put in two-by-sixes for the rafters or space the two-by-fours two feet apart, and to put studs in the walls for stapling insulation and hanging sheetrock. Waldroup testified that the windows were not properly installed, the ceiling rafters were cut too short, the roof was bowed, and birds, bees, and bugs would come in through the spaces between the walls and the roof. He also testified that he is unable to use the building when the wind is blowing or if it is raining, and he is unable to use the second floor of the building. He testified

that when the wind blows, "the place shifts and it squeaks and rattles," and when it rains the roof and the windows leak. He testified that he complained to Dravenstott about these deficiencies during each stage of the construction, but that Dravenstott would not listen to him and would make various comments, such as "That's good enough," and "It ain't nothing but an old barn anyway," and "What difference does it make?" When asked on cross-examination about his reasons for paying Dravenstott despite his dissatisfaction, Waldroup testified that he was afraid that if he did not pay, Dravenstott would have caused him physical harm.

Waldroup testified that he tried to get Dravenstott to repair the building, to no avail. Waldroup testified that Dravenstott promised to return to fix the leaks when the weather cleared up, and he did return, but when it began raining he left with another promise to return. Waldroup also testified that Dravenstott crammed insulation in the spaces between the walls and the roof.

Mr. Waldroup retained Charles Logan, a civil engineer, to inspect the building in order to identify various alleged deficiencies. Logan alleged numerous defects, including the failure to put two-by-four trusses or two-by-sixes on twenty-four inch centers in the roof and an overhang completely around the building. He testified that the roof was noticeably bowed, and when the wind was blowing it vibrated and shook noticeably. He also stated that wood intended to be used only in a stud application was used in the roof rafters. He testified that the ceiling joists were all cut short, and there were spaces between the roofing and the load-bearing wall. He testified that the ceiling joists were not sufficient for the intended loads that would be placed on them, and that the building flexes and moves when the wind blows and when the temperature changes. Logan concluded that the building was not structurally safe and he estimated the life expectancy of the building to be "maybe two to three years." Logan's opinion was not based on the building contract between Dravenstott and the Waldroups.

Mr. Waldroup obtained a bid from Marvin Fruits, a carpenter, to "correct the problems and finish the project" at a cost of $15,700.00. Fruits testified that Waldroup requested an estimate as to "what it would take to make his shop useable to insulate" and to sheetrock. Upon his inspection of the building, he concluded that the building techniques appeared to "have been intended for a hay barn" and that the building "might have passed as a hay barn." He testified that the lumber used was a stud or utility grade. He testified that the structure is not strong enough to withstand the shop upstairs or the wind. Fruits submitted a proposal to Waldroup, which included putting in studs for insulation and sheetrock and adding ceiling joists and rafters. Fruits estimated his labor at $350.00 per day for twenty-five days, totaling about $8,750.00. Fruits acknowledged that he had not reviewed the building contract between Dravenstott and Waldroup. His proposal was based on what Waldroup told him.

Testifying on Dravenstott's behalf were Robert Quick, a civil engineer, William Morrow, the supplier of the construction materials, and Dravenstott himself. Quick testified that he reviewed the building contract and the plan and inspected the building on two occasions. He testified that in his opinion, the building was constructed in accordance with the contract and plan and that the building was "structurally sound for its purpose." Quick described the purpose as "a barn to use as a workshop, shed, storage at this point."

Morrow was the owner and manager of Morrow & Sons Lumber Company in Lawson. He supplied and delivered the lumber and other materials to the job site and identified six invoices reflecting those materials and the cost. Morrow inspected the building when Waldroup claimed the No. 3 materials were used. During his inspection, Morrow located numerous pieces of lumber having a No. 2 stamp. He also located some without such stamps, but stated that these boards were probably on the low end of No. 2 or better, which will "happen in some bundles."

Waldroup also had pointed out to Morrow one board on a side wall that had been burned. Waldroup was concerned that he had gotten forest fire lumber in his boards.

Morrow could not explain the presence of the black char, but he did testify that forest fire lumber is not allowed to be cut, that it "should not have been in there if it was shipped from me," and that he didn't know whether the charring had occurred prior to or after construction.

Dravenstott testified that he had been a carpenter for about twenty-eight years, doing all kinds of construction work, including re-modeling, building new houses, pouring con-crete, and plumbing. The Waldroups' build-ing was the first building of that type he had constructed. In his dealing with Mr. Wal-droup, Dravenstott used a plan, consisting of two sketches, to put together his proposal. Based on his conversation with Waldroup, Dravenstott concluded that he would do a "rough-in job." After beginning his work, Dravenstott encountered various problems, including some of the outside posts being warped or too short. He also had to grade the ground inside the building site to level it, which caused some of the posts to be shorter than the rest. The differences in height of these posts also required Dravenstott to build a short wall to make the roof level.

When questioned about his awareness of Waldroup's dissatisfaction with his work, Dravenstott testified that Waldroup never complained and that he was unaware of any problems until he was served with the peti-tion. Dravenstott also denied having any detailed discussions with Waldroup about his intended future use of the building and claimed that he simply followed the plan provided by Waldroup.

The trial court entered judgment for the Waldroups. This appeal followed.

### Standard of Review

■ We will affirm the trial court's judgment when substantial evidence supports it, it is not against the weight of the evidence, and the trial court correctly declares and applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will set aside the trial court's decision only when firmly convinced that the judgment is wrong. *Lenger v. Lenger*, 939 S.W.2d 11, 13 (Mo. App. W.D.1997).

### Point I

Dravenstott's first point on appeal is that the trial court erred as a matter of law because the judgment is against the weight of the evidence and because several key findings of fact are not supported by the evi-dence. Dravenstott contends that the evi-dence does not support the Waldroups' alle-gation that he breached the construction contract by constructing a building that was not in accordance with the provisions of the contract and local and state building codes. Instead, Dravenstott contends, the credible evidence indicates that he constructed a building in accordance with the building con-tract and a plan provided by Mr. Waldroup.

### Breach of Contract

■ We first address whether Dravenstott breached the contract. In this case, the contract contains an express warranty that all work is "to be completed in a workman-like manner according to standard practices." Workmanlike performance has been defined as "work which is completed in a skillful manner and is non-defective." *Jake C. Byers, Inc. v. J.B.C. Investments*, 834 S.W.2d 806, 818 (Mo.App. E.D.1992).

■ The trial court adopted Logan's in-spection report, which stated that the build-ing contained numerous defects. On appeal of a court-tried case, we defer to the trial court on factual issues because it is in a better position not only to judge the credibili-ty of witnesses directly, but also their sincer-ity and character and other trial intangibles that may not be completely revealed by the record. *Law v. City of Maryville*, 933 S.W.2d 873, 876 (Mo.App. W.D.1996). In this case, we defer to the trial court's finding that Logan was a credible witness. There was substantial evidence from Logan, Fruits, and Mr. Waldroup that the building was defec-tive, and therefore Dravenstott breached the express warranty that all work would be completed in a workmanlike manner.

Dravenstott contends that he did not know Waldroup's intended use for the building. The trial court found that Dravenstott knew that Waldroup intended to use the building as a workshop, and the building was not

suitable for its intended use. While there is substantial evidence to support the trial court's finding, Dravenstott's knowledge of Waldroup's intended purpose for the building is not crucial to the outcome of this appeal. The evidence indicates that the building would be unsuitable for almost any purpose. It was definitely not suitable for use as a workshop, as contemplated by the contract.

■ Dravenstott also contends that the issue of who drew the sketch is a crucial one in this case because he relied on the sketch in constructing the building. It is unclear who drew the sketch, but even if Waldroup drew it, there was substantial evidence to support the trial court's finding that Waldroup was a layperson not familiar with the construction of buildings. The evidence also showed that Dravenstott was an experienced builder, and he had the obligation to comply with the express warranty in the contract mandating that work be done in a "workman-like manner." If constructing the building according to the sketch would produce substantial defects in the building, Dravenstott had a duty to not construct the building in such a manner.

Because we find that Dravenstott breached the contract, we find it unnecessary to discuss whether his work complied with the applicable codes.

*Damages*

■ Dravenstott contends that the measure of damages is incorrect in this case because Fruits' proposal includes many items that were not part of the original contract. The two examples Dravenstott gives are the studs in the walls and the addition of ceiling joists. The studs were not specifically provided for in the original contract. However, the trial court could have reasonably concluded that because the contract stated that the building was going to be a workshop, and Dravenstott admitted he knew that Waldroup planned to sheetrock the second floor of the building, Dravenstott should have understood that he was to prepare the building for sheetrock by adding the studs. As for the addition of the ceiling joists, this was an item provided for in the original contract. Fruits' proposal simply calls for the size of ceiling joists that will make the building structurally sound.

■ Dravenstott also contends that the measure of damages is incorrect because the problems about which the Waldroups complained are not remedied by Fruits' proposal. We find no authority that requires the Waldroups to remedy every problem about which they have complained in order to obtain damages.

Point I is denied.

**Point II**

■ Dravenstott's second point on appeal is that the trial court erred as a matter of law when it entered judgment for the Waldroups because the Waldroups waived all alleged breaches in the contract. Dravenstott argues that although Mr. Waldroup claimed that he notified Dravenstott of each omission during each respective stage of construction and that Dravenstott refused to comply with his demands, Waldroup permitted Dravenstott to continue with construction of the building and then paid him in full upon presentation of the bill for completion of the project.

The Waldroups contend that because Dravenstott did not raise the issue of waiver as an affirmative defense at trial, he waived his right to raise the issue on appeal. Dravenstott responds that because testimony regarding waiver was presented without objection, and such evidence was not relevant to any other issue in the case, the pleadings were deemed amended by implication or consent under Rule 55.33(b) to include the issue of waiver. *Leonards v. U–Jin Enterprises, Inc.,* 811 S.W.2d 480, 485 (Mo.App. S.D.1991). We agree. Dravenstott's counsel questioned Mr. Waldroup, without objection, about his motive for paying Dravenstott if he was dissatisfied with the job he had done. Because this testimony is not relevant to any issue other than waiver, the issue of waiver was preserved for appeal even though it was not affirmatively pleaded.

We next discuss whether there was a waiver in this case. Neither Dravenstott nor the Waldroups requested that the trial court

make written findings of fact in this case. Therefore, the trial court was not required to make specific findings. Rule 73.01(a)(3); *Hulshof v. Noranda Aluminum, Inc.*, 835 S.W.2d 411, 419 (Mo.App. S.D.1992). Accordingly, the fact issues upon which written findings were not made are considered to have been found in accordance with the result reached. *Id.* In this case, no specific finding of fact was made as to waiver. Therefore, we will not disturb the trial court's conclusion that there was no waiver in this case.

Point II is denied.

## Point III

Dravenstott's third point on appeal is that the trial court erred as a matter of law when it awarded the Waldroups an attorney's fee, prejudgment interest, and a per annum inflationary rate on the damage amount. The Waldroups' prayer for relief reads as follows:

WHEREFORE, THE PREMISES CONSIDERED, Plaintiffs pray for judgment against Defendant Lonnie Dravenstott in the sum of $20,000.00, together with an award of attorney's fees, costs, and interest at the legal rate, from and after judgment.

During trial, Mr. Waldroup testified that he was only seeking $15,750.00, the amount of Fruits' estimate.

The trial court granted the Waldroups judgment against Dravenstott in the amount of $15,750.00 plus three percent per annum inflationary rate from and after September 1, 1996, a partial attorney's fee of $500.00, and interest at the statutory rate of nine percent per annum from and after July 26, 1996, the date the Waldroups filed their petition. Costs were taxed to Dravenstott.

### Attorney's Fee

As to the attorney's fee, the Waldroups requested attorney's fees in their petition. However, Missouri follows the "American rule," which requires that litigants bear the expense of their own attorney's fees, with the following exceptions: (1) a statute or a contractual provision allows for their recovery; (2) the fees are incurred due to involvement in collateral litigation; or (3) equity demands it. *Marcomb v. Hartford Fire Ins. Co.*, 934 S.W.2d 17, 19 (Mo.App. W.D.1996). None of the exceptions apply in this case. Therefore, the trial court erred in awarding the Waldroups the attorney's fee.

### Prejudgment Interest

Although the Waldroups did not specifically request prejudgment interest, Missouri courts have found that an award of prejudgment interest is not dependent on an express petition allegation seeking such relief. *Holtmeier v. Dayani*, 862 S.W.2d 391, 406 (Mo.App. E.D.1993); *Addison v. Jester*, 758 S.W.2d 454, 460 (Mo.App. W.D.1988). A general, open-ended request for relief will suffice to allow a court to award prejudgment interest. *See, e.g., Jaron Corp. v. Pellet*, 866 S.W.2d 897, 901 (Mo.App. S.D.1993) (prayer requesting "such other relief as this Court deems just and proper in the premises" was sufficient to authorize the award of prejudgment interest); *Dierker Associates, D.C., P.C. v. Gillis*, 859 S.W.2d 737, 746 (Mo.App. E.D.1993) (prayer requesting "such other relief as may be proper" was sufficient); *General Aggregate Corp. v. LaBrayere*, 666 S.W.2d 901, 910 (Mo.App. E.D.1984) (prayer requesting "such other relief as may be proper under the premises" was sufficient). However, in this case, not only did the Waldroups not make a general request for relief, they specifically requested interest only "from and after judgment." Therefore, the trial court erred in awarding the Waldroups prejudgment interest.

### Per Annum Inflationary Rate

As to the per annum inflationary rate, the Waldroups did not request this type of relief. However, under Rule 55.33(b), "where evidence is presented without objection leading to a different damage total than that pleaded, that issue has been tried by implied consent and is treated in all respects as if it had been raised in the pleadings." *Edward L. Bakewell, Inc. v. Hall*, 767 S.W.2d 348, 350 (Mo.App. E.D.1989). In this case, the testimony of Mr. Fruits concerning the inflationary rate was as follows:

Q. Okay. Now, when you did this estimate, it was probably three or four months ago?

A. Yes. It was at least three or four months.

Q. How would that stack up with the current costs for lumber and hardware material, whatever would be necessary to renovate the building?

A. At this present time, I have no exact figure of what the inflation rate on this lumber is, but it generally runs about 3 percent a year I would— I would recommend.

\* \* \* \* \*

Dravenstott did not object to any part of this testimony. Dravenstott's failure to object to the evidence of the inflationary rate paved the way for the trial court to include the inflationary rate in its damages award. *Licare v. Hill*, 879 S.W.2d 777, 779 (Mo.App. E.D.1994). However, the only evidence of the inflationary rate pertained to the lumber. There was no evidence of the inflationary rate of labor costs or the other construction materials. Therefore, the trial court erred in including the three percent inflationary rate on Fruits' entire proposal. The inflationary rate should have been included only on the portion of the damages award that pertained to the lumber.

Dravenstott further argues that Mr. Fruits' testimony was not competent on the issue of the inflationary rate. However, Dravenstott did not object to the competency of Mr. Fruits' testimony at trial. Therefore, the issue is not preserved on appeal. *Eichelberger v. Barnes Hosp.*, 655 S.W.2d 699, 705 (Mo.App. E.D.1983).

.Point III is denied in part and sustained in part.

The judgment of the trial court is affirmed in part and reversed in part and remanded for a determination of damages in accordance with this opinion.

All concur.